262 S.W.2d 18 (1953)
WOLFMEYER
v.
OTIS ELEVATOR CO.
No. 43390.
Supreme Court of Missouri. Division No. 1.
November 9, 1953.
*19 George E. Heneghan, St. Louis, for appellant.
Luke, Cunliff & Wilson and John B. Busch, St. Louis, for respondent.
VAN OSDOL, Commissioner.
This action was instituted by plaintiff, an employee of Crosley Distributing Corporation, which corporation, a lessee, occupied the first floor and basement of a four-story building situate on Locust Street in St. Louis. The action was instituted against the owners of the building, and Otis Elevator Company was joined as a party defendant. The Elevator Company was obligated by contract with defendant owners to furnish "Otis (elevator) Maintenance."
Plaintiff sought recovery for personal injuries occasioned by falling into the shaft of the elevator used for the movement of merchandise to and from the several floors of the building. It was plaintiff's theory that Otis Elevator Company was liable because the maintenance contract provided that Otis Elevator Company was "to maintain the elevators in proper and safe operating condition"; that the "closing and interlocking device on the north shaftway gate at the first floor (where plaintiff fell) permitted the shaftway gate to be raised when the (elevator) car was not at the first floor, and that such condition was dangerous to the safety of persons using said elevator.'"
At the conclusion of the evidence introduced in plaintiff's behalf, a settlement was effected between plaintiff and the defendants, owners of the building; and, at the conclusion of all of the evidence, plaintiff's case was submitted to the jury against defendant Otis Elevator Company only. A verdict for plaintiff was returned assessing his damages at the sum of $9000. Defendant Otis Elevator Company has appealed from the ensuing judgment.
The elevator involved is located on the south (the alley) side about the middle of the Locust Street building. It was constructed in 1920. It is twenty feet long and about nine feet wide. The elevator car has metal sides six feet high. There are gates about five feet high across the north and south entrance apertures of the elevator shaft. The north gate at the main (first) floor level is provided with a "spring *20 loaded" latch. In opening the north gate "you reached up over the top of that gate and got hold of the latch and unlocked it." Plaintiff was injured when he opened the north elevator gate on the first floor and stepped and fell into the elevator shaft. At the time, the elevator car was at the second-floor level.
Although the elevator gates at other floors of the building were equipped with electrical interlocking devices making it impossible to open a gate unless the elevator car was at the particular floor level, the north gate of the elevator at the first floor was not equipped with such an interlocking device; however, there was some evidence indicating that the gate may have formerly had such an installation. The "spring loaded" latch was not and had not been such a device. There was no substantial evidence introduced tending to show that, during the term of defendant's maintenance contract, there had been an interlocking device making it impossible to open the elevator gate at the first-floor level when the elevator car was on the level of some other floor, that is, there was no substantial evidence that such an interlocking device had been or was installed at the north gate on the first floor at the time or since defendant contracted to furnish "Otis Maintenance."
The "Otis Maintenance" contract had been entered into May 15, 1940, with L. M. Stewart, Inc., then tenants occupying the building. On June 4, 1947, L. M. Stewart, Inc., cancelled the elevator maintenance service theretofore provided by defendant under the contract; the owners of the building assumed the obligation of L. M. Stewart, Inc.; and defendant Otis Elevator Company continued its maintenance service under the terms of the original contract. The (material) terms of the contract, in the form of proposals, which proposals had been accepted by L. M. Stewart, Inc., are as follows,
"We propose to furnish Otis Maintenance on the following described elevators in your building located at 3224 Locust Street, St. Louis, Missouri: One (1) Otis Electric Freight Elevator.
"Under this contract we will maintain the entire elevator equipment as hereinafter described, on the terms and conditions subsequently set forth. We will use trained men directly employed and supervised by us. They will be qualified to keep your equipment properly adjusted, and they will use all reasonable care to maintain the elevators in proper and safe operating condition.
"We will regularly and systematically examine, adjust, lubricate as required, and, if conditions warrant, repair and replace: Machine, Motor, General and Controller Parts including Worms, Gears, Thrusts, Bearings, Brake Magnet Coils or Brake Motors, Brake Shoes, Brushes, Windings, Commutators, Rotating Elements, Contacts, Coils, Resistance for Operating and Motor Circuits, Magnet Frames and other mechanical partsusing only genuine Otis Parts for this purpose.
"We also agree: To keep the guide rails properly lubricated at all times, and when necessary renew guide shoe gibs to insure smooth and quiet operation.
"To periodically examine all safety devices and governors, and equalize the tension on all hoisting ropes.
"To renew all wire ropes as often as necessary to maintain an adequate factor of safety, and repair and/or replace conductor cables.
"To furnish Otis Lubricants prepared in our own factory.
"We will also examine, lubricate, adjust, repair and/or replace the following accessory equipment: Hatch gates, gate contacts, annunciator and wiring and car light.
"The following items of elevator equipment are not included in this contract: None
*21 "The items listed on the schedule below show considerable wear and will have to be replaced in the near future. To provide you with the maximum of service from these items, we are accepting them in their present condition with the understanding that you are to pay, in addition to the base amount of this contract, an extra at the time the items listed are first replaced. The charge for this replacement will be determined by pro-rating the total cost of replacing the individual items. You are to pay for that portion of the items used prior to the date of this contract and we are to pay for that portion used since the date of this contract.
"Schedule of Parts to be Pro-Rated
"Name Of Part Installed
"None
" * * * It is mutually understood that we are not required to make renewals or repairs necessitated by reason of negligence or mis-use of the machinery, apparatus or car, or rendered necessary due to any other cause beyond our control. We shall not be required to make safety tests; nor to install new attachments on the elevator as recommended or directed by insurance companies, or government, state, municipal or other authorities.
"It is expressly understood, in consideration of our performance of the service enumerated herein at the price stated, that nothing in this agreement shall be construed to mean that Otis Elevator Company assumes any liability on account of accidents to persons, or property; except those directly due to the negligent acts or omissions of Otis Elevator Company or its employees; and that your own responsibility for accidents to persons or property while riding on or being in or about the elevators referred to is in no way affected by this Agreement. * * * No work, service or liability on the part of Otis Elevator Company other than that specifically mentioned herein, is included or intended. * * *"
The defendant Otis Elevator Company proposed to perform its service for $32 per month. By supplemental agreement the cost of the service was increased in June 1950 to $38.80 per month.
Otis Elevator Company, defendant-appellant (hereinafter generally referred to as "defendant"), contends that under its contract to furnish "Otis Maintenance" it had no obligation whatsoever to install new elevator equipment consisting of an interlocking device such as would keep the elevator gate on the first floor from being opened when the elevator car was not at the level of that floor. Defendant asserts the evidence shows that all of the parts of the elevator as they existed were functioning properly; and that defendant's contractual duties were properly performed. Defendant argues that it cannot be substituted for the owners of the building as to their obligations to plaintiff. And there being no privity of contract between plaintiff and defendant, and defendant, having carefully and entirely performed its contractual duties in the maintenance of the elevator as constructed, owed no further duty to plaintiff to protect him from harm.
It is elementary that actionable negligence consists mainly of three fundamental elements (1) the duty or obligation of the defendant to protect plaintiff from injury, (2) a failure to discharge such duty, and (3) injury proximately resulting from such failure. Whealen v. St. Louis Soft Ball Ass'n, Inc., 356 Mo. 622, 202 S.W.2d 891.
The contract is of interest to us because it shows what defendant undertook to do. Some of the things defendant undertook to do were such as might affect the safety of third persons, including plaintiff. And in doing the things which the defendant knew or should have known affecting the safety of third persons, defendant had a duty to such third persons to do carefully what it undertook to do.
In the case of Lambert v. Jones, 339 Mo. 677, 98 S.W.2d 752, 759, cited by plaintiff-respondent, this court spoke of the liability *22 of an agent or servant to third persons for his negligence. The court was treating with the troublesome rule of nonliability for "nonfeasance." Said the court, "Of course, a servant should not be liable for failing to act outside of the scope of his employment. Limiting the definition of `nonfeasance' to neglect in failing to assume duties as a servant or agent at all, or to failure to act as to matters entirely outside the duties of such servant or agent, and denominating all acts or omissions in connection with duties within the scope of his employment, misfeasance will eliminate most of the situations out of which conflicting decisions usually have arisen. It would seem, however, that the test, which would be most reasonable, which would really eliminate the confusion resulting from attempting to classify various acts or omissions of agents or employees as misfeasance or nonfeasance, and by which all situations could be more clearly and correctly solved, would be the rule that a servant or agent is liable for acts or omissions causing injury to third persons whenever, under the circumstances, he owes a duty of care in regard to such matters to such third persons. In short, he would be liable whenever he is guilty of such negligence as would create a liability to another person if no relation of master and servant or principal and agent existed between him and someone else." In the Lambert case there are also many cases noted which hold that one who has been put in complete control and management of property is liable to third persons injured by his neglect to remedy some unsafe condition thereof. See also Orcutt v. Century Bldg. Co., 201 Mo. 424, 99 S.W. 1062; and compare Lahtinen v. Continental Bldg. Co., 339 Mo. 438, 97 S.W.2d 102. In Hudson v. Moonier, 8 Cir., 102 F.2d 96, 98, cited by plaintiff-respondent, defendant had agreed to maintain the truck "in good working order'. The defendant was the owner of the vehicle who had leased the vehicle (having no signal device) to plaintiff's employer.
As stated, whatever it was defendant undertook to do which it knew or should have known or foreseen would affect plaintiff's safety, the defendant had the duty to do it carefully. Although defendant was not to be held liable in an action for the breach of the contract with the owners, a defendant, by entering into a contract, may place himself in such a relation toward third persons as to impose upon him an obligation to act in such a way that they will not be injured. Prosser on Torts, § 33, at page 206. In Southeastern Elevator Co. v. Phelps, 70 Ga.App. 331, 28 S.E.2d 85, defendants, partners, had a contract with the occupier of a building to inspect the elevator and all of its parts and to make necessary repairs. It was alleged that the automatic mechanism which prevented the opening of the door while the elevator was in position had become defective or broken and would not work. The petition stated a cause of action. It appeared from the allegations of the petition that defendants were under a duty to the occupier of the building and its employees to inspect the elevator and keep it in repair, and defendants were negligent in failing to keep the automatic equipment in repair. Defendants knew or could have known by the exercise of ordinary care that their conduct would cause injury to plaintiff or some other user of the elevator and equipment. In Dahms v. General Elevator Co., 214 Cal. 733, 7 P.2d 1013, 1015, defendant Elevator Company was obligated by contract with plaintiff's employer to repair an elevator and had made weekly inspections. The elevator hoisting shaft broke so that the hoisting cables had no support. There was evidence upon which a jury could properly find that defendant negligently repaired the hoisting shaft. Defendant's duty was measured by analogy according to the "same rules that apply to manufacturers and vendors." Although "a machine may not be in its nature inherently dangerous, yet, if it is made so by the neglect of a manufacturer having notice and knowledge that it is to be used by others than the purchaser, and injury results to others than the purchaser, directly traceable to that negligence, such manufacturer is liable to the person injured because of that negligence." See also *23 Kahner v. Otis Elevator Co., 96 App.Div. 169, 89 N.Y.S. 185; Jones v. Otis Elevator Co., 231 N.C. 285, 56 S.E.2d 684. It is also "ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all." Marks v. Nambil Realty Co., 245 N.Y. 256, 157 N.E. 129; Berry v. Emery, Bird, Thayer Dry Goods Co., 357 Mo. 808, 211 S.W.2d 35; Sheridan v. Aetna Casualty & Surety Co., 3 Wash.2d 423, 100 P.2d 1024. In the Sheridan case the Aetna had assumed the responsibility of inspection and report.
In the instant case, we believe our problem is not one involving an act or omission in doing what defendant had undertaken (or assumed) to do. It would seem to us defendant, in the shown circumstances, had no duty to do anything with respect to the alleged unsafe condition alleged to have caused plaintiff's injury. Defendant was not the owner; had not been placed in complete control and management; had not contracted to install nor otherwise assumed the responsibility of installing any safety device; and had maintained the elevator, as it was, in safe operating condition.
It is contended by plaintiff-respondent that the language of the contract whereby defendant proposed to use all reasonable care "to maintain the elevators in proper and safe operating condition" imposed upon defendant the duty to "observe, report, replace and/or repair this dangerous condition."
The "dangerous condition," if so, was not due to any defect in the "spring loaded" latch nor to any part of the elevator as it existed when defendant began to furnish its maintenance service. The spring loaded latch or lock was in working order; and no evidence was introduced tending to show that the elevator or any of its equipment was out of repair, or was not in proper operating condition. An experienced machinist and elevator constructor, witness for plaintiff, testified that everything "functioned all right."
The contract whereby defendant was to furnish Otis maintenance did not contain any express provision or clause by which defendant was to reconstruct or rebuild or modernize the elevator or install any new part (except as a replacement), nor did the contract expressly provide for any service except service to the elevator as it was when defendant began to furnish its maintenance service. There was no contractual provision obligating defendant to construct or install safety appliances or attachments, and there was no evidence introduced tending to show that defendant otherwise voluntarily assumed to make any new safety installations. It was mutually understood that defendant would "not be required to make safety tests; nor to install new attachments on the elevator as recommended or directed by insurance companies, or government, state, municipal or other authorities." And, in general, the word "maintain" does not mean to construct. Vol. 26, Words and Phrases, Maintain, pp. 68-72. It has been said that the word "maintain" means "to keep up; to keep from change; to preserve; to hold or keep in any particular state or condition". Barber Asphalt Paving Co. v. Hezel, 155 Mo. 391, 56 S.W. 449, 451, 48 L.R.A. 285; Lucas v. St. Louis & S. R. Co., 174 Mo. 270, 73 S.W. 589, 61 L.R.A. 452; Otis Elevator Company v. Embert, Md., 84 A.2d 876, 883; Webster's New International Dictionary, 2d Ed., page 1484.
In the case of Otis Elevator Co. v. Embert, supra, plaintiff instituted an action against the owner of the building. The defendant owner impleaded Otis Elevator Company as a third-party defendant, alleging that Otis was liable to the defendant owner for breach of contract to furnish maintenance on the elevator in question. Plaintiff filed an amended petition against the owner of the building and Otis, alleging negligence of each. A verdict was rendered for plaintiff and against both defendants, and for Otis in the third-party action. Otis appealed. In that case the elevator was so constructed that the shaftway gate could be opened even though *24 the elevator car was anywhere within thirteen inches above or below the floor level, although ordinarily the car would stop automatically within one inch of the floor. There was evidence tending to show that the elevator in question had been stopped prematurely from the inside by a prior passenger. The elevator had no self-leveling device. Such a device could have been and frequently was installed on the particular type of elevator. The reviewing court reversed the judgment as against Otis, saying, in part, "There is no evidence that Otis actually undertook more than it contracted to undertake. Otis's contract to use care `to maintain the entire elevator equipment' means what it says and no more. `Maintenance' does not include operation or supervision of operation or advice regarding operation. * * * Plaintiff argues that the accident shows that the elevator was not `in proper and safe operating condition'. Otis's undertaking was not to make the elevator a different kind of elevator or to insure it against improper or negligent operation."
In Sabiston's Adm'r v. Otis Elevator Co., 251 Ky. 222, 64 S.W.2d 588, 589, defendant Otis Elevator Company was under contract with the owner to keep an elevator in repair. There was an eleven-inch space between the hoist door and the elevator door. The defendant Otis Elevator Company was charged with negligence in manufacturing and placing the elevator in the hoist shaft when there was so much space between such doors; and negligence in permitting "the space between the hoist door and the elevator door to remain and be used as the approach to the elevator." It was conceded that the elevator and its equipment were in perfect mechanical condition. The reviewing Court of Appeals of Kentucky said, "The Otis Elevator Company was not the owner of the building, it had neither title nor possession at the time Sabiston sustained his injury. * * * The negligence of the owner of the building who contracted with the Otis Elevator Company to place the elevator and equipment in the hoist way was the sole cause of his (Sabiston's) injury and death * * *. The making, the leaving, and the reducing of the space between the hoist door and the elevator were entirely outside the contract of the Otis Elevator Company * * * under which it had furnished and installed the elevator machinery and equipment * * *." See also Digelormo v. Weil, 260 N.Y. 192, 183 N.E. 360.
Dobson v. Otis Elevator Co., 324 Mo. 1147, 26 S.W.2d 942, cited by plaintiff-respondent, is to be readily distinguished from our case. In the Dobson case the defendant Otis Elevator Company had been employed to repair the elevator in the building occupied by plaintiff's employer. Mechanics, employees of Otis, removed the brake, worm and armature from the elevator motor so that the elevator car had a tendency to descend (and did) of its own weight when occupied by nine persons. The defendant Otis, of course, was, in part, in control of the elevator while making repairs and, in making the repairs, brought about the very condition which made the elevator unsafe. Although the mechanics employed by Otis knew the elevator was unsafe, they took no precautionary measures to protect plaintiff from harm. Indeed, the agent of Otis had said to the occupier of the building that the elevator would be out of commission for several days, and had assured the occupier that precautions would be taken but gave the Otis mechanics no instructions to do what he, the Otis agent, had told the occupier that Otis would do.
Plaintiff-respondent also contends defendant negligently failed to comply with rules promulgated pursuant to ordinance of the City of St. Louis. Defendant asserts that obligations imposed by ordinance applicable to elevators were imposed on owners and not on maintenance contractors.
A part of Rule 5 promulgated by the Elevator Rules Committee, pursuant to Section 1393 of the Building Code of the City of St. Louis, Revised Code 1948, is as follows,
" * * * In the above interlock system the interlock shall prevent the *25 opening of the hoistway doors from the landing side unless the car is at rest within the landing zone or is coasting through the landing zone with its operating device in the `stop' position."
And a portion of Rule 8 is as follows,
" * * * If the entire control of the freight elevator is not located on the car, the hoistway doors and gates shall be arranged so that the doors or gates cannot be opened from the landing side unless the car is within the landing zone * * *."
Section 1397 of the Building Code, supra, provides as follows,
" * * * Equipment legally installed prior to the adoption of this article may be used without being reconstructed to comply with the provisions of the rules for new installations, provided ample public safety is maintained by the owner and the owner keeps the equipment in safe operating condition."
If we have correctly analyzed defendant's obligation to the owners of the building as evidenced by the maintenance contract, then it would seem that the rules promulgated by the Elevator Rules Committee pursuant to Section 1393, supra, were not applicable to and imposed no obligation upon defendant inasmuch as defendant was not the owner; did not construct or install the elevator; and was not in control and management of the elevator. Sabiston's Adm'r v. Otis Elevator, supra. The rules promulgated by the Elevator Rules Committee pursuant to Section 1393, supra, when read in connection with Section 1397, supra, are not so broad in their terms as are Sections 6786 and 6806 R.S. 1919 (now respectively Sections 292.020 and 292.210 RSMo 1949, V.A.M.S.), enacted for the safety of employees, and making it a misdemeanor for the owner, agent, lessee or occupant of a stated establishment, business or calling "who shall violate, or aid or abet in violating" any provisions of Sections 292.010 to 292.250. See Tomlinson v. Marshall, 208 Mo.App. 381, 236 S.W. 680, cited by plaintiff-respondent.
The judgment should be reversed.
It is so ordered.
LOZIER and COIL, CC., concur.
PER CURIAM.
The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court.
All of the Judges concur.